UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No. 15-cv-04080-KAW

CARLOS CONDE, et al.,

Plaintiffs,

v.

OPEN DOOR MARKETING, LLC, et al.,

Defendants.

**ORDER DENYING 20/20 COMMUNICATION'S MOTION FOR JUDGMENT ON THE PLEADINGS; GRANTING IN PART AND DENYING IN PART 20/20 COMMUNICATION'S MOTION TO DENY CLASS CERTIFICATION; GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXPAND THE SCOPE OF CERTIFIED COLLECTIVE ACTION**

Re: Dkt. Nos. 139, 143, 144

Plaintiffs Shikwana Jennings and Lisa Drake filed the instant suit against Defendants 20/20 Communications, Inc. ("20/20"), Open Door Marketing, LLC ("Open Door"), Larry Clark, and Jerrimy Farris, alleging violations of the Fair Labor Standards Act ("FLSA") and various California labor laws. (Third Amended Compl. ("TAC") ¶¶ 1-2, Dkt. No. 97.) Pending before the Court are the following motions: (1) Plaintiffs' motion to expand the scope of the certified collective action and issue additional notice, Dkt. No. 139 ("Plfs.' Mot. to Expand"); (2) 20/20's motion to deny class certification, Dkt. No. 143 ("20/20 Mot. to Deny Cert."); and (3) 20/20's motion for judgment on the pleadings, Dkt. No. 144 ("20/20 Mot. for Judgment on the Pleadings").

The Court held a hearing on the motions on March 30, 2017. Having considered the papers filed by the parties, the relevant legal authority, and the arguments advanced by counsel at the hearing, the Court rules as follows: (1) Plaintiff's motion to expand the scope of the certified collective action is GRANTED IN PART AND DENIED IN PART; (2) 20/20's motion to deny

class certification is GRANTED IN PART and DENIED IN PART, and (3) 20/20's motion for judgment on the pleadings is DENIED.

## I.    BACKGROUND

### A.    Factual Background

Plaintiffs Jennings and Drake previously worked for Defendants "to promote free cell phones and wireless service plans for low-income individuals who meet the plans' requirements." (TAC ¶ 1.)  Plaintiffs allege that they were misclassified as independent contractors, resulting in Defendants failing to pay them minimum wage, overtime, and expenses, as well as providing itemized wage statements.  (TAC ¶ 2.)

In June 2013, 20/20 first began providing marketing services for providers of wireless service plans and cellular phones.  (Burks Decl. ¶ 2, Dkt. No. 143-7.)  Until October 2014, 20/20 contracted directly with individuals to promote wireless service plans and cellular phones as "Sales Representatives."  (TAC ¶ 16; Burks Decl. ¶ 2.)  Since June 2013, to become a "Sales Representative," individuals were required to submit an application through 20/20's online application portal.  (Warren Decl. ¶ 2, Dkt. No. 143-3.)  As part of the onboarding process, individuals were presented with the Mutual Arbitration Agreement ("20/20 MAA").  (Warren Decl. ¶ 4.)  All newly-retained Sales Representatives were required to execute the 20/20 MAA; 20/20 asserts that it was not possible for an individual to advance to the next step of the onboarding process without executing the 20/20 MAA, as the individual would then receive an error message.  (Warren Decl. ¶ 4, Exh. B.)  The 20/20 MAA requires the parties to resolve all disputes and claims between the parties through final and binding arbitration unless the individual opts out of the 20/20 MAA by delivering a completed and signed opt-out form to 20/20's Vice President of Human Resources.  (Warren Decl., Exh. C ("20/20 MAA") ¶¶ 1, 10.)  20/20 alleges that 186 individuals in California and 204 individuals in Nevada contracted with 20/20 "on or after September 24, 2013."  (Warren Decl. ¶ 10.)  No individuals in California or Nevada submitted opt-out forms.  (Warren Decl. ¶ 9.)

Plaintiffs allege that from September 2012 to October 2014, 20/20 and the individual Defendants controlled the manner in which workers "performed their marketing work," including

retaining the right to terminate, setting and monitoring performance goals, setting hours and work locations, requiring workers to send supervisors a photo of themselves at work to prove their attendance at the required time, requiring the use of a script, requiring regular attendance of meetings, requiring attendance of pre-employment training, requiring use of a uniform while working, setting disciplinary standards, requiring the use of company-provided tablets, and requiring workers to report to their supervisors how many customers they signed up each day. (TAC ¶ 17(a).)

In October 2014, 20/20 and the individual Defendants allegedly "jointly created [Open Door] as a 'spin off' company from 20/20." (TAC ¶ 18.) Sales Representatives would contract directly with Open Door rather than 20/20. As part of the onboarding process, Open Door required Sales Representatives "to execute an independent contractor agreement . . . ." (Clark Decl. ¶ 5, Dkt. No. 143-5.) Since January 1, 2016, Open Door has used a version of the independent contractor agreement ("Open Door ICA") that includes a mandatory arbitration provision. (Clark Decl. ¶ 6, Exh. A ("Open Door ICA") ¶ 13.) The arbitration provision requires that "[a]ny controversy between the parties to this Agreement involving the construction or application of any of the terms, provisions, or conditions of this Agreement" shall be submitted to mediation and binding arbitration. (Open Door ICA ¶ 13.) There does not appear to be an opt-out provision. Of the 526 individuals who contracted with Open Door in California, 48 were engaged after January 1, 2016; of the 187 individuals who contracted with Open Door in Nevada, 4 were engaged after January 1, 2016. (Clark Decl. ¶ 8.)

As with 20/20, Plaintiffs allege that Open Door and the individual Defendants controlled the manner in which workers "performed their marketing work," including retaining the right to hire and terminate, setting and monitoring performance goals, setting hours and work locations, requiring workers to send supervisors a photo of themselves at work to prove their attendance at the required time, requiring the use of a script, requiring regular attendance of meetings, requiring attendance of pre-employment training, requiring use of a uniform while working, setting disciplinary standards, requiring the use of company-provided tablets, and requiring workers to report to their supervisors how many customers they signed up each day. (TAC ¶ 19(a).)

Plaintiffs also allege that during this time, 20/20 acted as a joint employer of these individuals because workers "acted in the interest of 20/20," and 20/20 maintained the right to hire, fire, and otherwise modify the employment condition of workers. (TAC ¶¶ 20(a)-(b).) 20/20 also "retained the right to supervise and control . . . work schedules," and supervisors were required to participate in weekly meetings with 20/20, "during which they discussed the weekly number of sign-ups achieved . . . , the locations where [workers] should work, the standard operating procedures for [workers], and new [Open Door] agent hires." (TAC ¶ 20(c).) 20/20 also retained the right to determine the rate of pay. (TAC ¶ 20(e).) There was also "no change in the work responsibilities or payment methods of those [individuals] who transitioned from working for 20/20 directly to [Open Door] directly." (TAC ¶ 20(f).) 20/20 also continued to provide workers with the tablets necessary to perform their work, as well as technology support. (TAC ¶ 20(g).)

### B. Procedural Background

Plaintiffs filed the instant action on September 8, 2015. (Compl., Dkt. No. 1.) Plaintiffs filed the operative complaint on May 12, 2016, asserting claims for: (1) failure to pay minimum wage in violation of the FLSA; (2) failure to pay overtime in violation of the FLSA; (3) failure to pay minimum wage and overtime in violation of the California Labor Code; (4) failure to provide workers with itemized wage statements in violation of California Labor Code § 226; (5) failure to reimburse workers for expenses in violation of California Labor Code § 2802; (6) unlawful business practices in violation of California Business & Professions Code § 17200; and (7) penalties under the Private Attorneys General Act ("PAGA"), California Labor Code § 2698 *et seq.*[1] (TAC ¶¶ 25-53.)

Following the commencement of this action, the parties filed a series of motions. On October 23, 2015, Plaintiffs filed a motion for notice to be issued to similarly situated employees pursuant to 29 U.S.C. § 216(b). (Dkt. No. 21.) On December 7, 2015, Open Door filed a motion to compel arbitration and dismiss, or alternatively, stay claims; a motion to dismiss based on forum non conveniens and Rule 12(b)(3); and a motion to dismiss pursuant to Rule 12(b)(6), or

---

[1] Jennings asserts the PAGA claim on behalf of Defendants' California workers. (TAC ¶¶ 50-52.)

alternatively, for a more definite statement pursuant to Rule 12(e). (Dkt. Nos. 49, 50 51.) 20/20 also filed a motion to dismiss Plaintiffs' complaint, or alternatively, for a more definite statement, as well as a motion to compel arbitration and dismiss, or alternatively, stay claims. (Dkt. Nos. 53, 54.)

On April 12, 2016, the Court issued an order on the parties' motions. (Ord., Dkt. No. 92.) First, the Court denied the motion to dismiss based on forum non conveniens, finding that the forum selection clause did not apply to the claims asserted in the action. (*Id.* at 6.) Second, the Court granted 20/20's unopposed motion to compel arbitration of former Plaintiff Carlos Conde. (*Id.* at 7.) Third, the Court granted 20/20's motion to dismiss on the ground that Plaintiffs failed to "identify the particular conduct attributable for each defendant," as Plaintiffs instead used the term "Defendants" throughout the complaint, which "failed to give each defendant fair notice of the claims asserted against them and the grounds upon which those claims rest." (*Id.* at 9-10.) Fourth, the Court granted Open Door's motion to dismiss as to claims asserted against Open Door prior to September 2014, and as to claims asserted against Defendants Farris and Clark specifically due to the lack of "any allegations describing what conduct Farris and Clark engaged in that would expose them to liability for the wage and hour violations Plaintiffs allege." (*Id.* at 10-11.) Finally, the Court held in abeyance Plaintiffs' motion for notice to be issued to similarly situated employees pending the filing of the third amended complaint and the parties' meet and confer on the scope of the class. (*Id.* at 15.)

After Plaintiffs filed their operative third amended complaint, the parties stipulated to the issuance of notice to all individuals who worked for Open Door "as independent contractors marketing free cell phones and wireless service plans to potential consumers face-to-face in Nevada and California from October 2014 to the present" who have not entered into an arbitration agreement with either Open Door or 20/20. (Dkt. No. 104 at 2.) Plaintiffs' counsel would then issue notice to these individuals, after which class members would have 60 days to opt into the collective action. (*Id.* at 2-3.) The parties would then participate in a full-day private mediation. (*Id.* at 3.) In the interim, the case would be stayed in its entirety, and Plaintiffs' motion for notice would remain held in abeyance. (*Id.*) On June 28, 2016, the Court granted the stipulation and

stayed the case.  (Dkt. No. 107.)

On September 2, 2016, Plaintiffs filed an "emergency" motion requesting permission to distribute reminder opt-in notices.  (Dkt. No. 113.)  Prior to the Court ruling on the motion, Plaintiffs informed the Court that counsel had "mistakenly" e-mailed the reminder to the potential collective action members on September 9, 2016, despite not having received permission from the Court to do so.  (Dkt. No. 120.)  After the reminder e-mail was sent, Plaintiffs' counsel received 32 additional opt-in consent forms, which Plaintiffs filed with the Court.  Although Defendants argued that the additional opt-ins should be stricken as being "influenced by the improper communications," the Court declined to strike the additional opt-ins as "[d]oing so would only penalize the individuals who opted in, some of whom may have intended to opt in regardless of the reminder notice."  (Dkt. Nos. 121, 123 at 1.)

On November 29, 2016, Attorney David Sohn, counsel for Defendants Open Door, Larry Clark and Jerrimy Farris, moved to withdraw as attorney.  (Dkt. No. 124.)  Through this motion, the Court was notified for the first time that the mediation had taken place on November 10, 2016, but was unsuccessful, and that the parties had agreed to lift the stay on November 17, 2016.  (Dkt. No. 124-1 ¶¶ 3-4.)  The Court ordered the parties to submit a joint status report to explain the status of the case and any pending motions before the Court.  After the parties filed their joint status report, the Court lifted the stay and set a case management conference.  (Dkt. No. 127.)  On January 10, 2017, the Court granted Attorney Sohn's motion to withdraw.  (Dkt. No. 128.) Defendants Open Door, Larry Clark, and Jerrimy Farris are presently unrepresented.

On February 21, 2017, the Court held a case management conference with the parties. (Dkt. No. 137.)  Defendants Open Door, Larry Clark, and Jerrimy Farris did not appear.  The Court specially set a hearing on March 30, 2017, to hear Plaintiffs' motion to expand the scope of the collective action, as well as 20/20's motion to deny class certification and motion for judgment on the pleadings.  (*Id.* at 1-2.)  The parties were directed to stipulate to a shortened briefing schedule accordingly.  (*Id.* at 2.)  On February 22, 2017, the Court issued an order to show cause, directed at Defendants Open Door, Larry Clark, and Jerrimy Farris, ordering them to explain why they should not pay monetary sanctions in the amount of $500 for their failure to appear at the

case management conference. (Dkt. No. 138.) Defendants' response was due by March 10, 2017; as of the date of this order, no response has been filed. On April 6, 2017, the Court issued a second order to show cause as to Defendants Open Door, Larry Clark, and Jerrimy Farris. (Dkt. No. 168.)

On February 22, 2017, Plaintiffs filed their motion to expand the scope of the collective action. (Plfs.' Mot. to Expand, Dkt. No. 139.) On March 10, 2017, 20/20 filed its opposition to Plaintiffs' motion to expand the scope of the collective action. (20/20 Opp'n to Mot. to Expand, Dkt. No. 152.) No reply was filed.

On March 1, 2017, 20/20 filed its motion to deny class certification and motion for judgment on the pleadings as to Plaintiffs' PAGA claim. (20/20 Mot. to Deny Cert, Dkt. No. 143; 20/20 Mot. for Judgment on the Pleadings, Dkt. No. 144.) On March 10, 2017, Plaintiffs filed their oppositions to 20/20's motions. (Plfs.' Opp'n to Mot. to Deny Cert, Dkt. No. 151; Plf.'s Opp'n to Mot. for Judgment on the Pleadings, Dkt. No. 150.) On March 16, 2017, 20/20 filed its replies. (20/20 Reply re Mot. to Deny Cert, Dkt. No. 155; 20/20 Reply re Mot. for Judgment on the Pleadings, Dkt. No. 154.) The Court held a hearing on the motions on March 30, 2017. (Dkt. No. 163.) At the hearing, the Court permitted the parties to file supplemental briefs regarding the motion to expand the scope of the certified class. The parties filed their supplemental briefs on April 6, 2017. (Defs.' Supp. Brief, Dkt. No. 167; Plfs.' Supp. Brief, Dkt. No. 169.)

## II. DISCUSSION

### A. 20/20's Motion to Deny Class Certification

Federal Rule of Civil Procedure 23(c)(1)(A) "addresses the timing of a district court's class certification determination, and states: '*Time to Issue*: At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(c)(1)(A)). The Ninth Circuit has concluded that "[n]othing in the plain language of Rule 23(c)(1)(A) either vests plaintiffs with the exclusive right to put the class certification issue before the district court or prohibits a defendant from seeking early resolution of the class certification question." *Id.* at 939-40. Accordingly, "Rule 23 does not

preclude a defendant from bringing a 'preemptive' motion to deny certification." *Id.* at 939.

To obtain class certification, a proposed class must satisfy the prerequisites of Rule 23(a), which are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The purpose of these requirements is to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). The plaintiff must also satisfy the requirements for certification of "one of the types of class actions identified in Rule 23(b)." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015).

In the instant case, Plaintiffs ultimately seek to certify a Rule 23 class made up of "workers who have worked for 20/20 from September 2012 through the present and who have worked for Open Door from October 2014 to the present in California . . . ." (TAC ¶ 3.) 20/20 contends that Plaintiffs cannot satisfy the prerequisites of Rule 23 because Plaintiffs did not sign arbitration agreements with Defendants, whereas approximately 234 putative class members signed arbitration agreements with either 20/20 or Open Door.[2] (20/20 Mot. to Deny Cert at 5-6, 11.) Because Plaintiffs did not sign the arbitration agreements, 20/20 argues that Plaintiffs will be unable to demonstrate typicality, commonality, and superiority.

### i. Ripeness of Motion

---

[2] It is not clear how many total putative class members there are. 20/20 states that 186 individuals signed the 20/20 MMA, and that 526 individuals contracted with Open Door, 48 of whom signed the Open Door ICA. (20/20 Mot. to Deny Cert. at 5-6.) This would be a total of 712 potential class members. 20/20 then states that there were 535 individuals who did not enter into an arbitration agreement, 400 of whom had a last known address in California. (20/20 Mot. to Deny Cert. at 6 fn.5.) This would suggest a total putative class between 634 and 769.

As an initial matter, Plaintiffs argue that 20/20's motion is premature because "discovery has not yet taken place." (Plfs.' Opp'n to Mot. to Deny Cert. at 1.)  Plaintiffs argue that they "have had no opportunity to learn the circumstances surrounding the signing of these arbitration agreements, which might lead to procedural unconscionability defenses of which Plaintiffs are not currently aware." (*Id.* at 2.)

The Court finds that the discovery sought by Plaintiffs does not prevent the Court from ruling on the instant motion.  Plaintiffs seek to challenge the enforceability of the arbitration agreements; Defendants' motion, however, is premised on the fact that Plaintiffs did not sign arbitration agreements, but intend to certify a class that includes individuals who did sign the arbitration agreements.  Because of this distinction, Defendants argue that Plaintiffs cannot demonstrate typicality, commonality, and superiority, as required by Rule 23(a).  Plaintiffs do not dispute that they did not sign an arbitration agreement, while other individuals did.  Thus, the Court concludes that additional discovery is not required to decide the merits of Defendants' motion.

### ii.    Rule 23(a) Prerequisites

First, 20/20 argues that Plaintiff cannot satisfy the prerequisites of Rule 23(a) because "Plaintiffs are atypical and inadequate representatives." (20/20 Mot. to Deny Cert. at 11 (capitalization omitted).)  Typicality requires the Court to look at "whether the claims of the class representatives are typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011).  Typicality is generally a "permissive standard[]," such that "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Adequacy, in turn, considers whether the representative will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "A named plaintiff satisfies the adequacy test if the individual has no conflicts of interest with other class members and if the named plaintiff will prosecute the action vigorously on behalf of the class." *Circle Click Media LLC v. Regus Mgmt.*

*Grp. LLC*, Case No. 12-cv-4000-EMC, 2016 WL 1048046, at *9 (N.D. Cal. Mar. 11, 2016) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)).

In *Avilez v. Pinkerton Government Services, Inc.*, the Ninth Circuit in an unpublished decision vacated the district court's class certification order. 596 Fed. Appx. 579, 579 (9th Cir. 2015). There, the district court had certified classes and subclasses that included employees who signed class action waivers. *Id.* The named plaintiff, however, had signed an arbitration agreement that did not contain a class waiver, and the parties "did not dispute that those who signed such waivers have potential defenses that [the named plaintiff] would be unable to argue on their behalf." *Id.* Thus, "[t]o the extent the classes and subclasses include individuals who signed class action waivers, [the named plaintiff] is not an adequate representative, and her claim lacks typicality." *Id.* (internal citations omitted).

Citing to *Avilez*, the district court in *Tan v. GrubHub, Inc.* similarly found that a named plaintiff who had opted out of an arbitration agreement and class action waiver could not satisfy the typicality and adequacy requirements of Rule 23. Case No. 15-cv-5128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016). There, the plaintiff was one of two individuals in California to opt out, whereas all other GrubHub drivers were "potentially subject to some form of class action waiver as set forth in the GrubHub service agreements." *Id.* The district court explained that because the named plaintiff "is in a position unique from all but one other driver in California, his claims are not typical of the putative class members nor can he adequately represent the interests of those members, who are potentially bound by the arbitration and class action waiver provisions." *Id.* Further, the district court reasoned that the named plaintiff would not be able to make certain procedural unconscionability arguments, such as feeling compelled to accept the arbitration agreement or arguing that the opt-out provision was not sufficiently noticeable, given that the named plaintiff had successfully opted out of two separate agreements. *Id.* In support, the district court cited to *Avilez* as "instructive," and pointed to other cases where the district courts found no typicality and adequacy where the named plaintiff was not subject to an arbitration agreement that other putative class members were bound by. *Id.* (citing *Tsuchudy v. J.C. Penny Corp., Inc.*, Case No. 11-cv-1011 JM (KSC), 2015 WL 8484530, at *3 (S.D. Cal. Dec.

9, 2015) (finding lack of typicality and adequacy where putative class members employed after July 17, 2009 were subject to an arbitration agreement but the named plaintiffs who were employed prior were not subject to the arbitration agreements); *Quinlan v. Macy's Corporate Servs.*, Case No. CV 12-737 DDP (JCx), 2013 WL 11091572, at *3 (C.D. Cal. Aug. 22, 2013) (finding that the plaintiff's "union membership alone renders him atypical of the vast majority of the purported class members" where union members were not subject to arbitration agreements while non-union members were, such that "[a]pproximately 94.5% of the 84,000 employees [the named plaintiff] seeks to represent . . . agreed to arbitrate 'all employment-related legal disputes'")); *see also Circle Click Media LLC*, 2016 WL 1048046, at *9 (agreeing with the defendant that "neither Plaintiff[] is typical of the class action waiver subclass because neither signed an agreement that included a class action waiver").

Plaintiffs counter that *Avilez* is not binding and was "wrongly decided," and that the Court should instead follow the lead of *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016).[3] (Plfs.' Opp'n to Mot. to Deny Cert. at 18.) There, the defendants had "argue[d] in passing in a single sentence with a citation to an inapposite case that [the p]laintiffs' claims are not typical of the class because some class members have arbitration or release agreements with some [of the d]efendants, and the named [p]laintiffs were not party to the same agreements." *Nitsch*, 315 F.R.D. at 284. The district court rejected this argument because "'defenses that may bar recovery for some members of the putative class, but that are not applicable to the class representative do not render a class representative atypical under Rule 23.'" *Id.* (quoting *Barnes v.*

---

[3] Plaintiffs cite to other cases which do not support their position. For example, in *Tigges v. AM Pizza, Inc.*, the Court certified two classes: delivery drivers who had not signed arbitration agreements, represented by Tigges, and delivery drivers who had signed arbitration agreements, represented by Reeves. Case Nos. 16-10136-WGY, 1610474-WGY, 2016 WL 4076829, at *1 (D. Mass. July 29, 2016). While Reeves had signed an arbitration agreement, it does not appear that Tigges had likewise signed an arbitration agreement. *Id.* at *2 (discussing Reeves's signing of the arbitration agreement, but not Tigges). *Otomo v. Nevada Association Services, Inc.* did not involve an arbitration agreement at all, but a statute that required arbitration and mediation to exhaust a claim. No. 2:10-CV-2199 JCM (GWF), 2013 WL 1249598, at *3 (D. Nev. Mar. 25, 2013). The district court ultimately concluded that it did not need to decide the exhaustion issue because it was denying the motion to certify a class on other grounds. *Id.* at *3 n.3. Finally, *Herrera v. LCS Financial Services Corp.* only considered the issue of arbitration agreements in the context of predominance, not typicality. 274 F.R.D. 666, 681 (N.D. Cal. 2011).

*AT&T Pension Benefit Plan-Nonbargained Program*, 315 F.R.D. 488, 494 (N.D. Cal. 2010)).  In other words, the typicality inquiry looks at whether the "'putative class representative is subject to unique defenses which threaten to become the focus of the litigation,'" a concern that was absent where "there may be defenses unique to some class members other than the class representatives." *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  Therefore, "the fact that [the d]efendants may have affirmative defenses against some absent class members does not affect the Court's typicality analysis." *Id.*

The Court ultimately finds that the analysis in *Avilez* and *Tan* is more persuasive, as *Nitsch* did not appear to consider whether a plaintiff who is not bound by an arbitration agreement is able to challenge the enforceability of that arbitration agreement.  *See Tan*, 2016 WL 4721439, at *6 (concluding that the named plaintiff "has no standing to challenge the applicability or enforceability of the arbitration and class action waiver provisions . . . because, in light of his decision to opt out, they do not apply to him").  At this juncture, Plaintiffs are not personally affected by the arbitration agreements at issue because they have not signed agreements that contain similar terms; 20/20 cannot require Plaintiffs to arbitrate because Plaintiffs are not bound by any such agreement.  Plaintiffs therefore have no interest in the enforceability of the arbitration agreement itself, and lack the ability to challenge the agreements on behalf of individuals who did sign such agreements.  Thus, the defenses the named Plaintiffs are subject to are not typical of the class as proposed.

In addition to their citation to *Nitsch*, Plaintiffs raise a number of arguments for why the Court should deny 20/20's motion.  First, Plaintiffs dedicate the bulk of their opposition to arguing that the arbitration agreements at issue are unenforceable.  (Plfs.' Opp'n to Mot. to Deny Cert. at 7-16.)  This requires, however, that the Court determine whether Plaintiffs are able to challenge the enforceability of the arbitration agreements in the first place, given that Plaintiffs did not sign arbitration agreements.  In a footnote, Plaintiffs contend that the Court should consider enforceability because otherwise, a defendant could prevent "similarly situated individuals from joining together in a class action merely by treating them differently with respect to their employment agreements, but nothing else.  For example, a company which amends and updates its

1    employment agreement regularly . . . would be able to preemptively defeat class certification

2    solely because representative plaintiffs did not sign every potential version of its agreement." (*Id.*

3    at 4 n.5.)  Plaintiffs overstate the issue; the issue here is not merely that the employment

4    agreements are different, but that the differences themselves raise unique defenses as to some

5    putative class members, but not others, including Plaintiffs.  If multiple versions of an

6    employment agreement exist, but such versions have only superficial differences, the fact that a

7    named plaintiff signed one version but not the others would not affect typicality or adequacy if

8    those differences do not affect a named plaintiff's claims vis-à-vis the putative class.  Here,

9    however, the employment agreements do create different defenses, such that some putative class

10   members may be bound by arbitration while Plaintiffs are indisputably not.

11       Plaintiffs' citation to *Milbourne* does not inspire a contrary conclusion; there, the district

12   court concluded that the named plaintiff had standing to contest the defendant's motion to compel

13   the absent class members to arbitration, even though the named plaintiffs had not signed the

14   arbitration agreement.  Civil Case No. 3:12cv861, 2016 WL 1071564, at *7 (E.D. Va. Mar. 15,

15   2016).  This Eastern District of Virginia decision, however, was made *after* the class had already

16   been certified, as the defendants had failed to raise the issue in opposition to the motion for class

17   certification; thus, the individuals who had signed arbitration agreements were parties before the

18   court.  *Id.*  Notably, the court agreed that "[t]he fact that none of the three Named Plaintiffs signed

19   an arbitration agreement to which some class members may be subject admittedly affects the

20   typicality of the Named Plaintiffs' claims and their ability to adequately and fairly represent the

21   class as a whole."  *Id.*; *see also id.* at *6 ("where the named plaintiff has shown that there is an

22   actual, justiciable controversy between himself and the defendant, differences between the claims

23   and defenses available to the named plaintiff and to the class bear on the questions of typicality

24   and adequacy of representation under Fed. R. Civ. P. 23, rather than standing").  In other words,

25   the district court was rejecting the defendant's attempt to belatedly challenge typicality and

26   adequacy in the context of standing, when the defendant should have argued that issue during class

27   certification.   Here, however, a class has not yet been certified, and the putative class members

28   are not parties to the suit.  Thus, their claims -- and the defenses 20/20 has against such

13

individuals, including the enforceability of the arbitration agreement -- are not yet properly before the Court.  In light of this procedural posture, the Court does not consider Plaintiffs' arguments regarding the viability of the arbitration agreement.

Second, Plaintiffs argue that "[t]he fact that some putative class members signed arbitration agreements is . . . irrelevant, because, unlike [Plaintiff] Jennings, unnamed class members are 'not part of the lawsuit.'"  (Plfs.' Opp'n to Mot. to Deny Cert. at 20.)  Instead, Plaintiffs suggest that such absent class members have only a "passive role" and are "mere spectators of a representative action brought on their behalves," thus "render[ing] their arbitration provisions irrelevant and no bar to class certification."  (*Id.* at 20-21.)  In other words, "unnamed class members simply do not have active disputes or claims . . . in a Rule 23 representative action brought by an individual who is not bound to arbitrate."  (*Id.* at 21 n.15.)

The Court disagrees with this proposition, which would essentially permit courts to ignore arbitration agreements signed by every absent class member, so long as there is one named plaintiff who is not bound by the arbitration agreement.  While an absent class member may be "passive," they are still parties to a suit, whose claims are actively being litigated by class counsel.  Thus, a judgment in a class action "'will bind not only the presentative parties, but also all nonparticipating members of the class certified by the court.'"  *Ross v. Trex Co., Inc.*, No. C 09-670-JSW, 2013 WL 791229, at *1 (N.D. Cal. Mar. 4, 2013) (quoting *Roussel v. Wells Fargo Bank*, No. C 12-4057 CRB, 2012 WL 5301909, at *3 (N.D. Cal. Oct. 25, 2012); *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) ("a judgment in a properly entertained class action is binding on class members . . . .").  Whether they are "passive" or "active," their claims are being litigated, allowing a defendant to raise defenses that are unique to even absent class members.  Notably, when Plaintiffs' counsel raised the same argument in *Tan*, the district court rejected the argument, explaining:

> Were the Court to certify a class as Plaintiffs seek, *i.e.*, of all GrubHub drivers in California (*see* SAC ¶ 24), any judgment in this case would bind the unnamed class members (unless they opted out of the class)--in other words, the unnamed class members would become parties and their claims would be heard and adjudicated. *See, e.g.*, *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) ("What is most important to this case is that nonnamed class members are

parties to the proceedings in the sense of being bound by the settlement."); *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (noting that "an unnamed member of a *certified* class may be 'considered a 'party' for the [particular] purpos[e] of appealing' an adverse judgment") (emphasis and alterations in original); *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) ("Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power.").

2016 WL 4721439, at *5.

Finally, Plaintiffs argue that 20/20's motion should be denied to the extent it seeks to deny certification of putative class members who signed arbitration agreements with Open Door. (Plfs.' Opp'n to Mot. to Deny Cert. at 22.) As an initial matter, Plaintiffs point out that "20/20 is not a signatory to these agreements, and therefore cannot seek to benefit from them." (*Id.*) 20/20 contends that "[a]lthough not a party to the [Open Door] agreement, 20[/]20 may be able to assert it as a defense to absent class members' claims as a third-party beneficiary, and/or on a theory of equitable estoppel." (20/20 Reply re Mot. to Deny Cert at 2 n.1.) 20/20, however, fails to point to any legal authority or factual evidence in support of this proposition.

At this point, the Court agrees that just as the named Plaintiffs have no interest in the arbitration agreements to challenge their enforceability, 20/20 lacks an interest in the Open Door arbitration agreements to use it to deny certification of the putative class members who signed arbitration agreements.[4] While 20/20 also argues that "[Open Door] may assert the agreement as a defense," Open Door has not made any such argument and it is improper to grant 20/20's motion to deny certification on such a theoretical basis.[5] If Open Door seeks to assert the arbitration agreement as a defense, it may do so in opposition to any motion for class certification.

Accordingly, the Court finds that Plaintiffs cannot satisfy Rule 23's typicality prerequisite

---

[4] Because the Court finds that 20/20 lacks an interest in the Open Door arbitration agreements, it need not decide Plaintiffs' alternate argument that the Open Door arbitration agreement does not explicitly prohibit workers from bringing or participating in a class action. (Plfs.' Opp'n to Mot. to Deny Cert at 22.)

[5] Moreover, Defendant Open Door currently lacks counsel, due to prior counsel's withdrawal. (Dkt. No. 128.) Defendant Clark, Open Door's president, has acknowledged that he "cannot represent a corporate entity like [Open Door] in this litigation because [he is] not a licensed attorney." (Dkt. No. 124-3 at ¶ 4.) Thus, it is not clear that Open Door will ever bring motions to compel arbitration against the putative class members who signed arbitration agreements with it.

as to a class that includes individuals who signed the 20/20 MAA and are therefore possibly bound by an arbitration agreement.  The Court therefore GRANTS 20/20's motion to deny class certification as to these individuals, and DENIES 20/20's motion to deny class certification with respect to individuals who signed the Open Door ICA because 20/20 lacks an interest to enforce or rely on the Open Door ICA.  Because the Court has granted the motion on typicality grounds, the Court does not rule on 20/20's arguments that Plaintiffs also cannot satisfy adequacy, commonality, predominance, and superiority.

### B.   Plaintiffs' Motion to Expand Scope of the Collective Action

Plaintiffs move to expand the scope of the certified collective action, such that notice will be issued to:

> Individuals who worked as independent contractors for 20/20 Communications, Inc., and/or Open Door Marketing, LLC, marketing free cell phones and wireless service plans to potential consumers face-to-face in California and Nevada since September 24, 2013.

(Plfs.' Mot. to Expand at 1.)  The proposed collective action expands on the stipulated collective action, which included individuals "marketing free cell phones and wireless service plans to potential consumers face-to-face in Nevada and California from October 2014 to the present" who did not sign an arbitration agreement with either Open Door or 20/20.  (Dkt. No. 104 at 2.)  In other words, Plaintiffs seek to expand the scope of the collective action to include individuals in California and Nevada who entered into arbitration agreements with Defendants.

The FLSA requires employers to pay their employees a minimum wage.  29 U.S.C. § 206(a).  If an employer fails to comply with the FLSA, § 216(b) allows an aggrieved employee to bring a collective action on behalf of herself and "similarly situated" employees.  A collective action permits plaintiffs to lower the cost of vindicating their rights and promotes the efficient use of judicial resources.  *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

"[T]he majority of district courts in this Circuit use a two-step approach for determining whether employees are similarly situated under Section 216(b)."  *Woods v. Vector Mktg. Corp.*, No. C-14-264-EMC, 2015 WL 1198593, at *2 (N.D. Cal. Mar. 16, 2015).  At the first step, "the court determines whether the proposed class should be conditionally certified for the sole purpose

of sending out notice of the proposed action to the potential class members." *Feaver v. Kaiser Found. Health Plan, Inc.*, Case No. 15-cv-890-EMC, 2016 WL 324176, at *3 (N.D. Cal. Jan. 27, 2016). "The standard for the first step is a lenient one that typically results in certification." *Woods*, 2015 WL 1198593, at *3 (internal quotations and citations omitted). To satisfy this lenient standard, the plaintiff must simply establish that an "identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA." *Russell v. Wells Fargo Co.*, No. C07-3993 CW, 2008 WL 4104212, at *5 (N.D. Cal. Sept. 3, 2008) (internal quotation omitted). At this stage, "courts usually rely only on the pleadings and any affidavits that have been submitted." *Benedict v. Hewlett-Packard Co.*, No. 13-cv-119-LHK, 2014 WL 587135, at *5 (N.D. Cal. Feb. 13, 2014) (internal quotation omitted).

At the second step, "the party opposing certification may move to decertify the class once discovery is complete." *Feaver*, 2016 WL 324176, at *4. In deciding whether decertification is appropriate, the court makes factual determinations regarding the "propriety and scope" of the class. *Id.* The Court "considers three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Id.* (citing *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 467 (N.D. Cal. 2004). In contrast to the lenient first step, the second step applies a stricter standard. *Id.*; *see also Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835, 837-38 (N.D. Cal. 2010).

### i. Standing

As an initial matter, 20/20 argues that because neither Plaintiff worked directly for 20/20 as an independent contractor, Plaintiffs "do not have standing to claim, on behalf of [20/20's contractors], that 20/20 was their "employer" and violated the FLSA by misclassifying them as independent contractors. (20/20 Opp'n to Mot. to Expand at 8.)

Although Plaintiffs were not directly employed by 20/20, Plaintiffs have alleged that 20/20 is still liable as a joint employer. (TAC ¶ 20.) Thus, regardless of whether they were directly employed by 20/20 or Open Door, Plaintiffs allege that their injury is traceable to 20/20, due to

20/20 acting as a joint employer.

20/20 does not point to any authority that a plaintiff must be directly employed by a defendant. Such an argument would be contrary to federal guidance on the FLSA, which explains that "[a] single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA], since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer." 29 C.F.R. § 791.2. Thus:

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b). The courts have likewise recognized that "[s]eparate persons or entities that share control over an individual may be deemed joint employers under the FLSA." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 305 (4th Cir. 2006). In determining whether there is joint employment, the Ninth Circuit "has recognized that the concept of joint employment should be defined expansively under the FLSA . . . ." *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997).

When a plaintiff has alleged sufficient facts of joint employment, the district courts have found standing to bring a FLSA claim against both alleged employers. For example, in *Reed v. Friendly's Ice Cream, LLC*, the plaintiffs were employed at Friendly's restaurants. Civ. No. 15-CV-298, 2016 WL 2736049, at *1 (M.D. Penn. May 11, 2016). Half of the restaurants were owned directly by Friendly's Ice Cream ("FIC"), while the other half were owned by franchisees.

FIC filed a partial motion to dismiss, arguing that the plaintiffs "lacked standing to pursue claims against Friendly's restaurants owned by franchisees." *Id.* The district court denied the motion to dismiss, finding that the plaintiffs had sufficiently alleged a joint employment relationship between FIC and the franchisees, including that the same illegal employment practices took place at two separate restaurants, "that FIC maintains the same policies at all of the restaurants it owns and operates, and, through a joint employment relationship with its franchisees, enforces the same policies at restaurants owned by franchisees." *Id.* at *3; *contrast with Crumbling v. Miyabi Murrells Inlet, LLC*, 192 F. Supp. 3d 640, 644-47 (D.S.C. 2016) (finding lack of standing where the plaintiffs did not allege "any kind of joint employment theory that would confer standing against all of the defendants," and failed to make sufficient allegations of joint employment under the economic realities test).

In contrast, 20/20 cites to cases where there were no allegations of joint employment or inadequate allegations that the defendants were related. In *Henry v. Circus Casinos, Inc.*, the plaintiffs were current or former security guards for Mandalay Corporation, a subsidiary of Mandalay Resort Group. 223 F.R.D. 541, 542 (D. Nev. 2004). The plaintiffs brought a collective action on behalf of all Mandalay Resort Group security guards. *Id.* The plaintiffs did not allege joint employment; instead, they did not dispute that they only had standing to pursue claims against Mandalay Corporation. *Id.* at 544. Similarly, in *Perez v. Wells Fargo & Co.*, the plaintiffs brought claims against five separate corporate entities, but "allege[d] no facts showing how the five defendants are related, if at all, and allege no facts showing which of those defendants was the employer of each of the named plaintiffs in this case." No. C 14-989 PJH, 2015 WL 1887354, at *5 (N.D. Cal. Apr. 24, 2015).

Here, however, Plaintiffs have alleged that 20/20 is a joint employer, along with Open Door and the individual Defendants. (TAC ¶ 20.) In support of the joint employer theory, Plaintiffs allege that class members acted in the interest of 20/20, and that 20/20 maintained "the right to hire, fire, and otherwise modify the employment conditions of" workers.[6] (TAC ¶ 20(b).)

---

[6] Plaintiffs rely on the declaration of former Plaintiff Carlos Conde. (Plfs.' Mot. to Expand at 5-6.) In its order on Plaintiffs' motion to conditionally certify a class, however, the Court disregarded

This included interviewing workers, determining whether they will be hired, issuing badges to workers that were required for work, and deactivating workers who were terminated. Plaintiffs also allege that under both 20/20 and Open Door, the same tracking program was used to track the time each worker started and stopped work each day, and when they signed up customers. (TAC ¶ 20(c).) Workers' supervisors were also required to participate in weekly meetings with 20/20 to discuss the sign-ups achieved by workers, the locations where workers should work, standard operating procedures, and new Open Door hires. Plaintiffs also state that 20/20 retained the right to determine workers' rate of pay, provided necessary equipment, and dictated policies and procedures to the workers. (TAC ¶¶ 20(e), (g), (h).)

Plaintiffs also previously submitted declarations which support a finding of a joint employment relationship. For example, Paris Howard stated in her declaration that when working as an outreach agent, she was supervised by Derrick Lopez. (Howard Decl. ¶ 4, Dkt. No. 59-2.) Ms. Howard later was promoted to assistant manager, during which she received weekly e-mails from a 20/20 employee, providing the preliminary numbers of sign-ups for outreach agents. (Howard Decl. ¶ 25.) 20/20 also provided the equipment used by workers, including electronic tablets and tents. (Howard Decl. ¶ 26.) During one of her weekly meetings with Mr. Lopez, Mr. Lopez allegedly explained to her "that we were 'working through' 20/20 Companies, and drew a triangle diagram with 20/20 at the top, and other companies, including Open Door Marketing, at the bottom." (Howard Decl. ¶ 27.) Mr. Lopez also explained that he had been an employee of 20/20, and then had started up Open Door, "and that the two companies had a partnership whereby 20/20 backed Open Door Marketing." (Howard Decl. ¶ 28.) Mr. Lopez also allegedly stated that he was paid by 20/20. (*Id.*) Similarly, Kiyana Merchant stated in her declaration that while working for Open Door between March and July 2015, during her orientation and in subsequent meetings, Mr. Lopez explained that "20/20 provided the funding and equipment for the Oakland office." (Merchant Decl. ¶ 21, Dkt. No. 59-3.) When Ms. Merchant once inquired about getting permits, she was referred to 20/20. (Merchant Decl. ¶ 23, Exh. A.)

Mr. Conde's declaration "as his claims are subject to arbitration." (Ord. at 13 n.12.) Thus, the Court again disregards his declaration.

Such allegations suggest that there was a joint employer relationship. Notably, Defendants do not appear to challenge the allegations that 20/20 is a joint employer, instead arguing only that there is no allegation that 20/20 directly engaged or employed Plaintiffs. (20/20 Opp'n to Mot. to Expand at 8-9.) This is a distinction without a difference; whether 20/20 is a joint employer or direct employer, 20/20 is alleged to be the class members' employer, who is liable for misclassification. As discussed above, a worker has standing, and an alleged employer can be held liable under a joint employment theory. At this stage, the Court finds Plaintiffs' allegations of joint employment adequate, such that Plaintiffs have standing to represent individuals who contracted with 20/20 because Plaintiffs themselves have claims against 20/20 as their joint employer.

### ii. Similarly Situated

Next, the parties dispute whether Plaintiffs are similarly situated to workers who contracted with 20/20. In its prior order, the Court determined that "Defendants' alleged uniform practice of not paying minimum wage and overtime compensation constitutes an 'identifiable factual or legal nexus' that likely connects the various claims of potential class members." (Ord. at 15.) Thus, "[t]his policy may be sufficiently uniform to make the Plaintiffs 'similarly situated' to a proposed class," although not necessarily the class proposed by Plaintiffs at that time, which included all individuals who had promoted cell phones and wireless service plans for 20/20 and Open Door anywhere in the United States. (*Id.*)

Here, Plaintiffs again allege that there is an identifiable nexus, namely that "[r]egardless of whether these individuals worked directly for 20/20 or Open Door, they were misclassified as independent contractors, and were not paid minimum wage, or overtime for hours worked over 40 in one week." (Plfs.' Mot. to Expand at 5.) Further, Plaintiffs have alleged in their complaint that regardless of whether individuals were employed by 20/20 or Open Door, 20/20 and Open Door retained similar levels of control over their workers, including, for example, the right to hire and terminate workers, setting and monitoring performance goals, and setting hours and location of work. (TAC ¶¶ 17(a), 19(a).) 20/20, in turn, points to asserted "dissimilarities" between individuals who worked for 20/20 or Open Door, including the type of training received, the

frequency and nature of required meetings, the amount of pay per customer, and the number of hours required and actually worked.  (20/20 Opp'n to Mot. to Expand Cert. at 12-13.)

The Court again finds that there is an identifiable factual or legal nexus, namely that Plaintiffs allege that regardless of whether they were employed by 20/20 or Open Door, they were misclassified as independent contractors and therefore not paid minimum wage and overtime, as required by the FLSA.  The dissimilarities relied upon by 20/20 do not affect this alleged uniform policy or practice; the types of training, number or nature of meetings, and amount of pay do not necessarily affect the challenged practice, which is the misclassification of workers.  20/20 also fails to adequately explain how these dissimilarities show that the level of control retained by 20/20 and Open Door was so different as to affect whether or not workers were misclassified.  To the extent that these differences do impact the factual or legal nexus binding the claims of the proposed collective action together, "such issues are more appropriately addressed at step two, rather than the more lenient step one."  *Feaver*, 2016 WL 324176, at *5 (acknowledging that there were significant questions about whether individual inquiries were necessary, as well as questions going to the merits of the case, but ultimately granting the motion for conditional certification).

In the alternative, 20/20 argues that the collective action should not be expanded to include individuals who signed arbitration agreements because they are not similarly situated.  (20/20 Opp'n to Mot. to Expand at 13.)  In its prior order, the Court rejected this argument, explaining:

> To the extent any employee working directly for 20/20 did sign an arbitration agreement, the company will be free to move to dismiss the claims of any such employee who attempts to join this collective action.  Or better yet, the parties can meet and confer to ensure that any such individual are not improperly included in the class.  The Court, however, will not exclude potential class members based only on 20/20's assertion that these yet-to-be identified individuals signed an arbitration agreement.

(Ord. at 15.)  20/20 contends that the facts have changed as "the Court no longer has before it 'only 20/20's assertion' that putative class members signed arbitration agreements.  Rather, the record is now clear and uncontroverted that all those who contracted with 20/20, and all those who contracted with [Open Door] after January 1, 2016, did, in fact, sign arbitration agreements and that none of them chose to opt out of those agreements."  (20/20 Opp'n to Mot. to Expand at 14.)

Plaintiffs, in turn, argue that the Court already decided this issue in favor of Plaintiffs. (Plfs.' Mot. to Expand at 9.)

In FLSA cases, the courts have disagreed on whether a collective action may be conditionally certified when the named Plaintiffs are not subject to an arbitration agreement, but some putative collective action members are. In *Adami v. Cardo Windows, Inc.*, the district court excluded window installers who signed mandatory arbitration and/or class action waivers, finding that "Plaintiffs have not made a sufficient factual showing that installers who have signed mandatory arbitration or class action waiver agreements are similarly situated because Adami and Varner have not signed any such agreement." 299 F.R.D. 68, 81 (D.N.J. 2014). The district court also explained that the named plaintiffs would lack standing to contest the validity of the agreements. *Id.* Similarly, in *Morangelli v. Chemed Corp.*, the district court excluded technicians who signed arbitration agreements because such workers "are subject to unique defenses that cannot be bifurcated or sub-classed away." 10 Civ. 0876 (BMC), 2010 U.S. Dist. LEXIS 146149, at *13 (E.D.N.Y. June 15, 2010). Further, the district court noted that the defendants were "certain to file a motion to compel arbitration[, a]nd from a preliminary look at the plain language of the arbitration agreement, they have a strong chance of succeeding." *Id.* Thus, the district court found that "[i]t would be a disservice to judicial efficiency to certify all technicians, when those with arbitration agreements are subject to additional, prolonging motion practice which will likely disqualify them from the class." *Id.*

Notably, in this district, several courts have rejected the argument that the signing of arbitration agreements by some members of the proposed collective action bars conditional certification. In *Deatrick v. Securitas Security Services USA, Inc.*, the named plaintiff had opted out of the arbitration agreement. Case No. 13-cv-5016-JST, 2014 WL 5358723, at *3 (N.D. Cal. Oct. 20, 2014). Although the defendant argued that this meant that the named plaintiff was not similarly situated to those who had signed arbitration agreements, the district court found that conditional certification was "appropriate under the lenient standard applicable at this first stage . . . ." *Id.* at *4. As to the arbitration agreement, such agreements had "little to no bearing at this point in the litigation because they relate to whether 'disparate factual and employment settings'

23

exist with respect to the putative class members and to 'the various defenses available to the defendant with respect to each plaintiff.' [Citation.] These inquiries are reserved for the second stage of the certification process," and would be considered "if and when Defendant moves to decertify." *Id.* In *Saravia v. Dynamex*, the district court had found that the arbitration agreement against the named plaintiff was unenforceable, based on facts "that may have been unique" to the named plaintiff. 310 F.R.D. 412, 424 (N.D. Cal. 2015). Despite these potentially unusual circumstances, the district court found that "[n]o district court in our circuit has denied conditional certification on the basis that some members of the proposed collective may be subject to valid and enforceable clauses. The decisions that have addressed that issue have all found that the issue of enforceability of arbitration clauses related to the merits of the case and therefore should be dealt with in phase two." *Id.* Further, "it would be premature to assume that the issue of arbitration will be unmanageable at this phase, rather than reserving it for a motion for decertification, as other courts have done." *Id.* at 425. The district court did, however, limit the collective to California drivers only, in order to "ensure that the arbitration clauses are subject to only one state's laws, which will facilitate collective-wide treatment." *Id.*[7]

Outside this district, in *Maddy v. General Electric Co.*, non-union service technicians had agreed to resolve all disputes with the defendant through arbitration only. 59 F. Supp. 3d 675, 677 (D.N.J. 2014). None of the named plaintiffs, however, were subject to the arbitration agreements. *Id.* at 681. The district court ultimately granted conditional certification, stating: "That some service technicians have signed arbitration agreements does not preclude conditional certification of all service technicians across the United States. " *Id.* at 685 n.7. The *Maddy* court explained that unlike a class action, opt-in plaintiffs were not bringing claims on behalf of those similarly situated.

Like other courts in this district, the Court concludes that the arbitration agreements do not

---

[7] To the extent Defendants suggest that *Saravia* is distinguishable because "there is little prospect that this [arbitration] defense can be resolved on a collective-wide basis" in the instant case, Defendants' argument appears speculative at this point. (*See* Defs.' Supp. Brief at 2.) Moreover, if it turns out that individual inquiries are required to resolve the arbitration issue, then decertification would be appropriate at the second step.

preclude conditional certification at this point, especially given the lenient standard at step one. This lenient standard distinguishes conditional certification from class certification, which imposes certain prerequisites before class certification is permitted, such as typicality. In contrast, the focus of the step one inquiry is only on whether there is a common policy that binds together the claims of the collective; the fact that there is an arbitration agreement goes to Defendants' defenses, not the common policy. Thus, the enforceability of the arbitration agreements is better reserved for the step two determination, not step one.[8] To the extent 20/20 argues that the collective action should not be conditionally certified because the collective would almost certainly be decertified due to the arbitration agreement, such an argument presupposes that the arbitration agreement is enforceable. Should individuals who have signed arbitration agreements opt into the collective action, 20/20 may then bring a motion to compel arbitration against those individuals, who would then have standing to dispute whether the agreement should be enforced against them. The Court will not, however, at this point assume that the arbitration agreement is enforceable and can be used to prevent potential members of the collective from receiving notice, especially when the step one inquiry is so limited.

Accordingly, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion to expand the collective action to include individuals who signed the arbitration agreement from September 2013 on, but like *Saravia*, will limit the expansion to individuals in California in order to ensure the manageability of this case. The Court, however, agrees with Defendants that "the notice to individuals who entered into arbitration agreements 'reflect the possibility that an opt-in plaintiff will be compelled to arbitrate his or her claims.'" (Defs.' Supp. Brief at 3 n.2 (quoting *Saravia*, 310 F.R.D. at 426).) The parties are therefore ORDERED to meet and confer on an

---

[8] 20/20 suggests that sending notice in this case would be "futile" because "this Court has already held that the 20/20 agreement is enforceable, and on that basis, compelled Mr. Conde to submit his claims to arbitration." (20/20 Opp'n to Mot. to Expand at 17-18.) The Court, however, did not decide the enforceability of the 20/20 agreement. Instead, because Plaintiffs did not oppose the motion to compel arbitration, the Court granted the motion. (Ord. at 7-8.) Thus, the instant case is distinguishable from *Longnecker v. American Express Co.*, which distinguished cases that permitted certification of a collective action including individuals who signed arbitration agreements "because here, the court has already determined that the Arbitration Policy is valid and defendants have already moved to compel arbitration as to some employees." No. 2:14-cv-0069-HRH, 2014 WL 4071662, at *7 (D. Ariz. Aug. 18, 2014).

appropriate notice for people who opted into arbitration agreements.

### C. 20/20's Motion for Judgment on the Pleadings

Finally, 20/20 moves for judgment on the pleadings as to Plaintiff Jennings's PAGA claim, on the ground that Plaintiff Jennings failed to adequately exhaust her administrative remedies under PAGA. (20/20 Mot. for Judgment on the Pleadings at 1.) Specifically, 20/20 argues that Plaintiff Jennings did not provide adequate written notice to the California Labor & Workforce Development Agency ("LWDA"), instead stating legal conclusions. (*Id.*)

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. Judgment on the pleadings is proper "when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "A motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). In determining whether a moving party has satisfied this standard, the court treats the opposing party's allegations as true, and construes them in the light most favorable to that party. *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventists Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) (internal citation omitted). Nonetheless, "[c]onclusory allegations of law and unwarranted inferences are insufficient to avoid" dismissal. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). In ruling on the motion, the court may consider facts which may be judicially noticeable.[9] *Mullis v. United States Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

In passing PAGA:

---

[9] A district court may take judicial notice of facts not subject to reasonable dispute that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). Here, 20/20 seeks judicial notice of various court records, namely PAGA letters that were filed in various cases cited by Defendants. (20/20 Request for Judicial Notice, 20/20 RJN, Dkt. No. 145.) Plaintiffs did not file an opposition. The Court GRANTS 20/20's request for judicial notice, as judicial notice may be taken of court records. *See* Fed. R. Evid. 201(b)(2); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980). ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases"). The Court considers the PAGA letters for their form only, and not for the truth of the matters asserted within.

> The Legislature declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market, and that it was therefore in the public interest to allow aggrieved employees, acting as private attorney generals, to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies were to retain primacy over private enforcement efforts.

*Arias v. Superior Court*, 46 Cal. 4th 969, 980 (2009). Prior to bringing a civil action for statutory penalties, an employee must comply with California Labor Code § 2699.3, which "requires the employee to give written notice of the alleged labor Code violation to both the employer and the [LWDA], and the notice must describe facts and theories supporting the violation." *Id.* at 981 (citing Cal. Labor Code § 2699.3(a).) If the agency notifies the employee and employer that it does not intend to investigate or fails to respond, the employee may then bring a civil action against the employer. *Id.*

At issue here is what information must be in the letter before an employee may bring suit. In *Alcantar v. Hobart Service*, the Ninth Circuit reviewed the following letter:

> Our offices have been retained by Joseluis Alcantara [sic] (Plaintiff). Plaintiff is a former employee of ITW Food Equipment Group, LLC aka Hobart Service (Defendant). Plaintiff contends that Defendant (1) failed to pay wages for all time worked; (2) failed to pay overtime wages for overtime worked; (3) failed to include the extra compensation required by California Labor Code section 1194 in the regular rate of pay when computing overtime compensation, thereby failing to pay Plaintiff and those who earned additional compensation for all overtime wages due; (4) failed to provide accurate wage statements to employees as required by California Labor Code section 226; (5) failed to provide reimbursement for work related expenses as required by Labor Code § 2802; and, (6) failed to provide off-duty meal periods and to pay compensation for work without off-duty meal periods to its California employees in violation of California Labor Code sections 226.7 and 512, and applicable Industrial Welfare Commission orders. Said conduct, in addition to the forgoing, violated each Labor Code section as set forth in California Labor Code section 2699.5.

800 F.3d 1047, 1057 (9th Cir. 2015). The Ninth Circuit found that this letter was merely "a string of legal conclusions with no factual allegations or theories of liability to support them," making it "insufficient to allow the [LWDA] to intelligently assess the seriousness of the alleged violations." *Id.* Instead, "[t]he only facts or theories that could be read into this letter are those implied by the

27

claimed violations of specific sections of the California Labor Code--that [the defendant] failed to pay wages for time worked, failed to pay overtime wages for overtime worked, failed to include the extra compensation required by § 1194 in the regular rate of pay when computing overtime compensation, and so on." *Id.* Such allegations were "insufficient." *Id.*

Here, the parties have jointly stipulated to the authenticity of the letter submitted by Plaintiff Jennings to the LWDA. (Dkt. No. 147-1, PAGA Letter.) The letter states in relevant part:

> My firm represents Shikwana Jennings in connection with her claims pursuant to the California Labor Code against 20[/]20 Companies LLC, Open Door Marketing LLC, Barry Millay, and Larry Clark (collectively, "Respondents"). Ms. Jennings worked for Respondents to promote their clients' cell phones and wireless service plans in Oakland, California, from February 2015 through June 2015. Because Respondents illegally misclassify their workers as independent contractors rather than employees, Shyp [sic] has violated numerous provisions of the California Labor Code.

(PAGA Letter at 1.) The letter goes on to state that the letter was a PAGA notice, and listed the statutes that were allegedly violated by Defendants.

The Court finds that the PAGA letter is adequate. In *Alcantar*, the letter simply stated that the plaintiff was a former employee, without identifying what position the plaintiff worked in and during what time period. The *Alcantar* letter then proceeded to list statutes that were allegedly violated. In contrast, while lacking in much factual detail, Plaintiff Jennings at least explains what her job entailed, and what period of time she worked. Significantly, Plaintiff Jennings then identifies the legal theory underpinning her claims, namely that she was misclassified as an independent contractor rather than an employee. By identifying her theory of misclassification, Plaintiff Jennings's letter is not limited to listing various statutes that Defendants allegedly violated, but explains the theory of liability that supports the violations she has identified in the letter.

Plaintiff's letter is comparable to that in *Stevens v. Datascan Field Services LLC*, which the district court found sufficient to satisfy PAGA's notice requirements. No. 2:15-cv-839-TLN-AC, 2016 WL 627362 (E.D. Cal. Feb. 17, 2016). There, the defendant had argued that the plaintiff provided inadequate notice. *Id.* at *4. The plaintiff, in turn, pointed to her allegations that "she

was employed by Defendant "as an associate field specialist at various third party customer locations since 2008 performing field vehicle audit and inspection related activities," and that the defendant had engaged in a scheme to require the plaintiff and other class members to work overtime and go without meal and rest periods "under the false pretense of being classified as exempt employees." *Id.* The scheme also included altering time records to reflect a lower number of hours worked. *Id.* Applying *Alcantar*, the district court found that the letter provided sufficient notice, as it "contains the specific statutes Defendant allegedly violated; facts about the position Plaintiff held; and a statement about Defendant's policies or practices of misclassifying her as an exempt employee and incorrectly rounding her work hours." *Id.* Like the *Stevens* letter, Plaintiff Jennings has identified the statutes allegedly violated, facts about the position she held, and a statement about the underlying theory of liability, specifically that she was misclassified as an independent contractor rather than an employee.[10] *See also Green v. Bank of Am.*, 634 Fed. Appx. 188, 190 (9th Cir. 2015) (finding adequate notice of a plaintiff's seating claim, where the plaintiff provided notice of the specific statute the defendant allegedly violated, facts about what position the plaintiff held, a statement that the plaintiffs could use a seat in their position, and a specific identification of who was allegedly harmed).

The cases cited by 20/20 involved PAGA letters that contained comparable levels of detail (or lack thereof) to that in *Alcantar*, and are thus distinguishable. For example, in *Amey v. Cinemark USA Inc.*, the letter simply stated that the defendant employed the plaintiff "as a non-exempt employee from March 2012 to September 2012 at [the defendant's] San Francisco, California, theatre location," and that the defendant did not provide the plaintiff "with properly itemized wage statements." Case No. 13-cv-5669-WHO, 2015 WL 2251504, at *13 (N.D. Cal. May 13, 2015). While the letter stated that the plaintiff was employed as a non-exempt employee, the plaintiff's claim was based not on the non-exempt status, but on the "'core' theory that [the] wage statements did not properly list overtime rates." *Id.* Thus, the theory underlying the claim --

---

[10] While the *Stevens* letter was 9 pages long, the vast majority of the *Stevens* letter was dedicated to listing the elements of her claims, rather than providing any additional facts or theory. (*See* Defs.' RJN, Exh. 17.)

29

United States District Court
Northern District of California

that the wage statements did not list overtime rates -- was not stated in the letter. Similarly, in *Raphael v. Tesoro Refining and Marketing Co.*, the district court found insufficient a letter which simply "mimicked the statute violated." Case No. 2:15-cv-2862-ODW, 2015 WL 5680310, at *4 (C.D. Cal. Sept. 25, 2015). While the *Raphael* letter did state that the plaintiff was employed as a non-exempt employee, it is not clear that the violations were based on a theory of misclassification. (*See* 20/20 RJN, Exh. 12.) Finally, in *Sinohui v. CEC Entertainment, Inc.*, the district court also found inadequate a letter which stated the plaintiff's position and that he performed non-exempt functions, before listing the statutes that were allegedly violated by the defendant. Case No. EDCV 14-2516-JLS (KKx), 2016 WL 3406383, at *3 (C.D. Cal. June 14, 2016). While 20/20 argues that this letter did allege misclassification, similar to the instant case, the Court disagrees. (20/20 Reply re Mot. for Judgment on the Pleadings at 5.) Although the *Sinohui* letter did state that the plaintiff performed non-exempt functions, it did *not* state that he was classified as an *exempt* employee either; thus, it was not apparent if the *Sinohui* plaintiff was alleging a theory of misclassification or simply that he was not being paid for overtime, regardless of his status. (*See* 20/20 RJN, Exh. 15.) Thus, none of the cases cited by 20/20 appear to list the underlying theory of the violations, in contrast to the instant case which explicitly ties the asserted violations to a theory of misclassification.[11]

Accordingly, the Court DENIES 20/20's motion for judgment on the pleadings.

### III.    CONCLUSION

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART 20/20's motion to deny certification. To the extent Plaintiffs seek class certification of a class that includes individuals who signed 20/20's arbitration agreement, class certification is denied. The Court GRANTS IN PART AND DENIES IN PART Plaintiff's motion to expand the collective

---

[11] In the reply brief, 20/20 argues for the first time that even if Plaintiff Jennings exhausted her administrative remedies by providing sufficient information about her claims, she did not meet the notice threshold to bring a PAGA claim against 20/20 because she never identified 20/20 as a "joint employer" in her letter. (20/20 Reply re Mot. for Judgment on the Pleadings at 8-9.) By raising this argument for the first time in its reply, 20/20 has waived the argument. *See Whiteway v. FedEx Kinkos Office & Print Servs., Inc.*, No. C 05-2320 SBA, 2007 WL 4531783, at *3 (N.D. Cal. Dec. 17, 2007) ("Courts decline to consider arguments raised for the first time in reply") (internal citations omitted).

and send notice, limited only to individuals in California; the parties are directed to meet and confer on the language of the notice, to state that individuals who signed an arbitration agreement may be required to go to arbitration. The Court DENIES 20/20's motion for judgment on the pleadings.

IT IS SO ORDERED.

Dated: April 27, 2017

_____
KANDIS A. WESTMORE
United States Magistrate Judge