UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIKWANA JENNINGS, et al.,<br>　　　　　Plaintiffs,<br>　　v.<br>OPEN DOOR MARKETING, LLC, et al.,<br>　　　　　Defendants. | Case No. 15-cv-04080-KAW<br><br>**ORDER GRANTING MOTION FOR SETTLEMENT APPROVAL**<br>Re: Dkt. No. 297 |

Plaintiffs Shikwana Jennings and Lisa Drake filed this putative class and collective action against Defendants 20/20 Communications, Inc. ("20/20"), Open Door Marketing, LLC ("Open Door"), Larry Clark, and Jerrimy Farris, alleging violations of the Fair Labor Standards Act ("FLSA") and various California labor laws. (Fourth Amended Compl. ("FAC") ¶¶ 1-2, Dkt. No. 195.) Pending before the Court is Plaintiffs' unopposed motion for settlement approval, which seeks to settle the claims of Plaintiffs and the 176 individuals who opted in to the collective action, as well as Plaintiff Jennings's representative claim for civil penalties under the Private Attorneys General Act ("PAGA"). (Plfs.' Mot. for Settlement Approval at 1, Dkt. No. 297; Plfs.' Supp. at 1, Dkt. No. 303.)

Having considered the papers filed by the parties, the relevant legal authority, and the arguments advanced by counsel at the August 16, 2018 hearing, the Court GRANTS Plaintiffs' motion for settlement approval.

## I.　BACKGROUND

### A.　Factual Background

Plaintiffs bring the present action on behalf of individuals who worked for Defendants "to promote free cell phones and wireless service plans for low-income individuals who meet the

plans' requirements." (FAC ¶ 1.) Plaintiffs allege that they were misclassified as independent contractors, resulting in Defendants failing to pay them minimum wage, overtime, expenses, and all wages due at the time of termination, as well as failing to provide itemized wage statements. (FAC ¶ 2.)

Until October 2014, Defendant 20/20 contracted directly with individuals to promote wireless service plans and cellular phones as "Sales Representatives." (*See* FAC ¶ 17.) To become a Sales Representative, individuals were required to execute a Mutual Arbitration Agreement. (Dkt. No. 216 at 3.) Plaintiffs allege that Defendant 20/20 would set and monitor performance goals, as well as the hours and locations of work for Sales Representatives. (FAC ¶ 17a.) Defendant 20/20 also required Sales Representatives to send a picture of themselves at work each morning to prove their attendance at the required time, use a script when performing job duties, regularly attend meetings, attend pre-employment training, wear a uniform while working, use company-provided tablets, and inform their supervisors how many customers they signed up each day. (FAC ¶ 17a.)

In October 2014, Defendant 20/20 and the individual Defendants (collectively "Open Door Defendants") allegedly "jointly created [Open Door] as a 'spin off' company from 20/20." (FAC ¶ 18.) From that point on, Sales Representatives would contract directly with Defendant Open Door rather than Defendant 20/20. The relationship between the Open Door Defendants and the Sales Representatives was largely the same as the prior relationship between Defendant 20/20 and the Sales Representatives, in that the Open Door Defendants set and monitored performance goals, as well as hours and locations of work. (FAC ¶ 18a.) Like Defendant 20/20, the Open Door Defendants also required Sales Representatives to send a picture of themselves at work each morning to prove their attendance at the required time, use a script when performing job duties, regularly attend meetings, attend pre-employment training, wear a uniform while working, use company-provided tablets, and inform their supervisors how many customers they signed up each day. (FAC ¶ 18a.) During this time, Plaintiff alleges that Defendants were engaged in a joint employer relationship. (FAC ¶ 20.) In January 2016, Defendant Open Door began using an independent contractor agreement that included a mandatory arbitration provision.

United States District Court
Northern District of California

**B.  Procedural Background**

Plaintiffs filed this action on September 8, 2015. (Compl., Dkt. No. 1.) On June 21, 2016, the parties stipulated to the issuance of notice to all individuals who worked for Defendant Open Door "as independent contractors marketing free cell phones and wireless service plans to potential consumers face-to-face in Nevada and California from October 2014 to the present" who had not entered into an arbitration agreement with either Open Door or 2020. (Dkt. No. 104 at 2.)

On February 24, 2017, Plaintiffs filed their motion to expand the scope of the collective action to include individuals who signed arbitration agreements with Defendants 2020 and Open Door. (Dkt. No. 139.) Defendants opposed the motion, arguing amongst other things that individuals who signed arbitration agreements were not similarly situated. (Dkt. No. 152 at 13.) On March 1, 2017, Defendant 20/20 filed its motion to deny class certification as to individuals who signed arbitration agreements with Defendants. (Dkt. No. 143.)

The Court granted in part and denied in part Defendant 20/20's motion to deny class certification, finding that the named Plaintiffs lacked typicality to represent individuals who had signed arbitration agreements with Defendant 20/20, when Plaintiffs themselves had not. (Dkt. No. 178 at 12.) The Court granted in part and denied in part Plaintiffs' motion to expand the scope of the collective action, finding that Plaintiffs satisfied the limited step one inquiry for conditional certification, but limiting the scope to individuals in California in order to ensure manageability. (*Id.* at 25.)

Defendants then filed a motion to compel arbitration of certain opt-in Plaintiffs who had signed arbitration agreements with Defendant 20/20. (Dkt. No. 216 at 1.) Plaintiffs opposed the motion to compel on three grounds: (1) waiver, (2) the class action waiver violated the National Labor Relations Act per *Ernst & Young LLP v. Morris*, 834 F.3d 975 (9th Cir. 2016), and (3) the class action waiver was unenforceable per *Gentry v. Superior Court*, 42 Cal. 4th 443 (2007). (Dkt. No. 219 at 1-3.) On November 8, 2017, the Court concluded that Plaintiffs failed to establish waiver and that *Gentry* was no longer good law with respect to contracts that are subject to the Federal Arbitration Act ("FAA"). (Dkt. No. 235 at 7.) The Court, however, stayed Defendant 20/20's motion to compel, pending the Supreme Court's review of *Ernst & Young LLP*. (*Id.* at 1.)

On June 13, 2018, Plaintiffs and Defendant 20/20 filed a notice of settlement. (Dkt. No. 289.) After the parties confirmed that Plaintiffs intended to dismiss the claims against the Open Door Defendants, the Court terminated all pending deadlines and motions, including Defendant 20/20's motion to compel, and ordered that the motion for settlement approval be filed by July 12, 2018. (Dkt. No. 295 at 1.)

On June 28, 2018, the parties filed a request that the Court clarify whether Plaintiffs were required to give formal notice to the opt-in Plaintiffs. (Dkt. No. 294 at 2.) On July 2, 2018, the Court issued an order stating that formal notice would not be required, but that Plaintiffs' counsel was to provide notice to the opt-in Plaintiffs stating that the case had settled and providing information on the hearing on the motion for approval. (Dkt. No. 296.)

On July 12, 2018, Plaintiffs filed the instant unopposed motion for settlement approval. On July 31, 2018, the Court ordered Plaintiffs to provide supplemental briefing on the motion for settlement approval. (Dkt. No. 302.) On August 8, 2018, Plaintiffs filed a supplemental brief.

The Court held a hearing on Plaintiffs' motion for settlement approval on August 16, 2018.

### C. Settlement Agreement

Under the terms of the settlement agreement, Defendant 20/20 agrees to pay $125,000. (Liss-Riordan Decl., Exh. A ("Settlement Agreement") ¶ II.A, Dkt. No. 297-1.) Of this amount, Plaintiff's counsel intends to seek an award of $25,000, or 20% to cover both attorneys' fees and costs. (Settlement Agreement ¶ II.D.3.) The settlement amount includes a $5,000 enhancement payment to Plaintiff Jennings and a $3,000 enhancement payment to Plaintiff Drake. (Settlement Agreement ¶ II.D.2.) Finally, the settlement amount includes $10,000 in PAGA penalties; $7,500 will go to the California Labor Workforce Development Agency ("LWDA") and $2,500 will be divided amongst California opt-in Plaintiffs, based on the number of weeks worked. (Settlement Agreement ¶ II.D.1.) This leaves a net amount of $82,000 for distribution to the opt-in Plaintiffs.

The settlement will be allocated based on the number of weeks worked. (Settlement Agreement ¶ II.D.5.) Specifically, Plaintiffs' counsel will calculate the number of weeks each opt-in Plaintiff claims to have worked for Defendants in California and Nevada. Each week worked in Nevada shall count as one "share," and each week in California shall constitute two "shares."

4

(Settlement Agreement ¶ II.D.5.a.) The total number of shares will be calculated. (Settlement Agreement ¶ II.D.5.b.) The total shares of each individual opt-in Plaintiff shall then be divided by the total number of shares to determine the percent of the net settlement amount to which the individual is entitled. (Settlement Agreement ¶ II.D.5.c-d.)

The opt-in Plaintiffs shall have 180 days to negotiate the checks. (Settlement Agreement ¶ II.E.4.) Uncashed checks will be transferred to the California Department of Industrial Relations--Unclaimed Wage Fund for California opt-in Plaintiffs, and to the Nevada Unclaimed Property Division for Nevada opt-in Plaintiffs.

After the hearing on Plaintiff's motion, the parties agreed to make certain changes to the Settlement Agreement.

First, the parties agreed to modify the communications section. Originally, this section provided that the parties and counsel shall not have any communications regarding the settlement with any person, subject to certain limited exceptions. (Settlement Agreement ¶ V.) The parties have limited the clause to act more as a non-publicity section, removing the prohibition on discussing the litigation or settlement with any person. (Dkt. No. 307.)

Second, the parties have limited the scope of the released claims. The Settlement Agreement initially sought to release all claims pled in the operative complaint, as well as claims that could have been pled in the operative complaint "based on the factual allegations in that complaint, including but not limited to any claims under state or federal statutes or common law regarding the payment of wages, including claims arising under the [FLSA] . . . and any in similar state law." (Settlement Agreement ¶ III.A.) The parties have since "agreed to limit the scope of the release in their settlement agreement to the claims asserted in the operative complaint." (Dkt. No. 310 at 2.)

## II.   LEGAL STANDARD

"The [FLSA] seeks to prohibit 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011) (quoting 29 U.S.C. § 202(a)).) Employees cannot waive their rights under the FLSA "because this would nullify the

5

purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (internal quotation omitted). "Thus, either the Secretary of Labor or a district court must approve the settlement for any FLSA claim." *Gonzalez v. Fallanghina, LLC*, Case No. 16-cv-1832-MEJ, 2017 WL 1374582, at *2 (N.D. Cal. Apr. 17, 2017); *see also Slezak v. City of Palo Alto*, Case No. 16-cv-3224-LHK, 2017 WL 2688224, at *1 (N.D. Cal. June 22, 2017).

"The Ninth Circuit has not established the criteria that a district court must consider in determining whether an FLSA settlement warrants approval." *Otey v. Crowdflower, Inc.*, Case No. 12-cv-5524-JST, 2015 WL 6091741, at *4 (N.D. Cal. Oct. 16, 2015). Courts in this district typically evaluate the settlement under the standard established by the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982). *E.g.*, *id.*; *Gonzalez*, 2017 WL 1374582, at *2; *Slezak*, 2017 WL 2688224, at *2. Thus, the courts consider whether the settlement agreement is "a fair and reasonable resolution of a bona fide dispute." *Lynn's Food Stores, Inc.*, 679 F.2d at 1355. If the settlement is a reasonable compromise over issues actually in dispute, the court may approve the settlement "to promote the policy of encouraging settlement in litigation." *Id.* at 1354.

### III. DISCUSSION

#### A. FLSA Settlement

##### i. Bona Fide Dispute

"A bona fide dispute exists when there are legitimate questions about the existence and extent of the defendant's FLSA liability." *Gonzalez*, 2017 WL 1374582, at *2 (internal quotation and modification omitted). Here, the parties disputed whether Plaintiffs were independent contractors or employees. (Plf.'s Mot. for Settlement Approval at 13.) Even if Plaintiffs were employees, the parties also disputed whether the outside salesperson exception would apply, which would preclude recovery for the overtime and minimum wage claims under the FLSA and California labor law. (*Id.*) Additionally, the parties disputed whether Defendant 20/20 could be deemed the joint employer of Plaintiffs who contracted directly with Defendant Open Door. (*Id.*) Finally, the parties had a dispute regarding the applicable time period of Plaintiffs' claims and the

number of hours worked, which would affect Plaintiffs' recovery. (*Id.*) The Court concludes that a bona fide dispute exists as to Defendant 20/20's FLSA liability.

### ii. Fair and Reasonable Resolution

To determine whether a settlement is fair and reasonable, the courts consider the "totality of the circumstances and the purposes of [the] FLSA." *Slezak*, 2017 WL 2688224, at *3 (internal quotation omitted). Courts have considered the following factors:

> (1) the plaintiff's range of possible recovery; (2) the stage of proceedings and amount of discovery completed; (3) the seriousness of the litigation risks faced by the parties; (4) the scope of any release provision in the settlement agreement; (5) the experience and views of counsel and the opinion of participating plaintiffs; and (6) the possibility of fraud or collusion.

*Id.* (quoting *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1173 (S.D. Cal. 2016)).

#### a. Range of Possible Recovery

Plaintiffs estimate that the total damages the opt-in Plaintiffs would have been entitled to is $511,379.05. (Plfs.' Mot. for Settlement Approval at 3.) This amount was calculated based on the limited workweek data provided by Defendants, as well as self-reported data provided by the opt-ins. (Plfs.' Supp. Brief at 4.) The parties did not have the precise hours worked by individuals, and Plaintiffs assumed a standard workweek of 60 hours and applied the federal minimum wage to reach their calculation.

At the hearing, Plaintiffs confirmed that this is the valuation for the FLSA claims only. As the Settlement Agreement seeks to release California state law claims as well, the actual full verdict value is significantly higher, given the broader range of California state claims and the higher California minimum wage. This affects the percentage of recovery that the settlement amount represents. As discussed below, however, the significant discount that the settlement represents compared to the full verdict value of the case is justified by the significant risks at issue, which could preclude all liability.

#### b. Stage of the Proceedings and Amount of Discovery Completed

Under this factor, the Court considers "the stage of proceedings and the amount of

7

discovery completed to ensure the parties have an adequate appreciation of the merits of the case before reaching a settlement." *Slezak*, 2017 WL 2688224, at *4. "So long as the parties have sufficient information to make an informed decision about settlement, this factor will weigh in favor of approval." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (internal quotation omitted).

This case has been pending for nearly three years. Numerous motions have been filed and resolved, including motions to compel arbitration, motions to dismiss, a motion to expand the scope of the certified collective action, a motion to deny class certification, and a motion for judgment on the pleadings as to the PAGA claim. (Dkt. Nos. 49, 50, 51, 53, 54, 139, 143, 144, 216.) The parties have also engaged in significant discovery, including the exchange of thousands of pages of documents. (Plf.'s Mot. for Settlement Approval at 17.) The parties also participated in a full-day mediation session in November 2016, prior to which Plaintiffs prepared a detailed damages estimate. (*Id.*; *see also* Dkt. No. 126.)

The Court concludes that the parties had sufficient information to make an informed decision about settlement, and that this factor therefore weighs in favor of approval.

### c. Seriousness of Litigation Risks

"This factor favors approving a settlement where there is a significant risk that litigation might result in a lesser recovery for the class or no recovery at all." *Slezak*, 2017 WL 2688224, at *4 (internal quotation and modification omitted). Here, Plaintiffs contend that the 75% discount is warranted because Plaintiffs faced a significant risk that the Court would conclude that even if Plaintiffs were misclassified as independent contractors, Plaintiffs would still be exempt from overtime and minimum wage requirements because they were outside salespeople. As discussed above, the discount is actually higher, as Plaintiffs do not consider the value of the California claims.

Under federal law, an outside salesperson is exempt where the employee: (1) makes sales or "obtain[s] orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer," and (2) is customarily and regularly engaged away from the employer's place of business. 29 C.F.R. § 541.500(a). Under California law, an employee is

8

considered an exempt outside salesperson if the person "customarily and regularly works more than half the time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services, or use of facilities." 8 C.C.R. § 11040(2)(M).

First, Plaintiffs point to *Vasto v. Credico (USA) LLC*, where the district court concluded that the plaintiffs -- who performed work similar to Plaintiffs in the instant case -- were outside salespeople. (Plf.'s Mot. for Settlement Approval at 15; Plf.'s Supp. Brief at 5. There, the plaintiffs were also field agents who signed up low-income customers for cell phones under a federal subsidy program. 15 Civ. 9298 (PAE), 2017 WL 4877424, at *1 (S.D.N.Y. Oct. 27, 2017). The plaintiffs used approved pitches and tablets provided by the defendant, and were paid on a commission basis for each qualified enrollee that they signed up. *Id.* at *3. The plaintiffs reported to work at the defendant's office each day, and participated in morning meetings to get guidance on how to solicit enrollees. *Id.*

The *Vasto* court found that the plaintiffs' primary duty was signing up applicants for the federal subsidy program, and that such activities constituted sales. 2017 WL 4877424, at *18. Although the field agents promoted a service that was ultimately provided free of charge to the qualifying applicants, the district court found that the cell phone company itself was compensated by the federal government for providing services to the qualified applicants. *Id.* Further, although the plaintiffs argued that they did not obtain a binding commitment from the potential applicant because the defendant could reject an applicant who was not eligible under the federal subsidy program, the district court explained that "[t]here is nothing in the FLSA . . . that limits the definition of an outside salesperson to someone who has the unfettered discretion to finalize a binding sale. Rather, it is enough for employees to have directed efforts toward the consummation of a sale." *Id.* (internal quotation and citations omitted). The *Vasto* court also found that the plaintiffs bore many of the indicia of outside salespeople, namely that they independently solicited new business in the form of applications for the subsidy program, received a commission-based salary, and worked away from the office with minimal supervision. *Id.* at *19.

Second, Plaintiffs point to *Dailey v. Just Energy Marketing Corp.*, in which the district

9

court found that the plaintiff whose primary job function was to solicit new customers for the defendant's services was an outside salesperson under California law. (Plf.'s Mot. for Settlement Approval at 15-16; Plf.'s Supp. Brief at 5.) There, the plaintiff reported to the regional office to attend morning meetings, where she would rehearse a 'pitch' with other door-to-door workers and share tips about how to persuade customers to sign up for services. Case No. 14-cv-2012-HSG, 2015 WL 4498430, at *1 (N.D. Cal. July 23, 2015). The plaintiff was directed to target certain geographic area. *Id.* The plaintiff's supervisor would not accompany her in the field, but would stay in contact via telephone and text message. When the plaintiff persuaded a customer to sign up, the defendant would have ultimate authority to reject an application. *Id.* Compensation was based on the number of new customers signed up. *Id.*

The district court concluded that the plaintiff was an outside salesperson. 2015 WL 4498430, at *3. Like *Vasto*, the district court rejected the argument that the plaintiff did not sell services because the customers' applications could be rejected. Instead, the district court found that the right to cancel a contract "does not change the fact that [the p]laintiff's job duties involved the 'selling' of or 'obtaining orders or contracts for [the defendant's] services." *Id.* (internal modification omitted). To find otherwise would be "to exalt form over substance. If an employee directs his efforts at persuading a particular customer to purchase a product and is compensated on the basis of his success in doing so then the employee is clearly engaged in sales activity and not mere general promotion of the product . . . ." *Id.* (internal quotation omitted). Additionally, the district court found that there were external indicia that the plaintiff was an outside salesperson, including that the plaintiff's compensation was in the form of commissions, the sole purpose of her job was to solicit new customers for the defendant, and that she was not directly supervised while in the field. *Id.* at *5.

Here, Plaintiffs share many of the same characteristics as the employees in *Vasto* and *Dailey*, creating a significant risk that they too would be found to be outside salespersons. For example, Plaintiffs spent most of their days outside the office, attempting to sign up customers for subsidized cell phones. (Plf.'s Supp. Brief at 5.) Plaintiffs were assigned locations; although they would have to prove that they were at their location by taking a picture of themselves, it does not

appear that they were directly supervised. (Jennings Decl. ¶¶ 9, 11, Dkt. No. 21-4; Drake Decl. ¶¶ 11-12, Dkt. No. 21-5.) Plaintiffs were paid by commission, and would use a script or pitch. (Jennings Decl. ¶ 17; Drake Decl. ¶¶ 11, 19.) Plaintiffs were only paid if the customer was qualified for the subsidy program. (Jennings Decl. ¶ 17; Drake Decl. ¶ 19.) Given these similarities, Plaintiffs ran the risk that they would be found to be outside salespersons, which would result in Plaintiffs obtaining no monetary relief.

Plaintiffs faced additional risks that could limit monetary relief. For example, Plaintiffs state that damages would be difficult to prove because Defendants did not maintain detailed information on the hours worked by Plaintiffs. (Plf.'s Supp. Brief at 17.) There was also a pending motion to compel arbitration that likely would have sent some of the opt-in Plaintiffs to arbitration, limiting their ability to litigate the case. (*Id.* at 14-15.) Further, there was the risk that the Court would not find Defendant 20/20 and the Open Door Defendants to be joint employers; in such a case, Plaintiffs who were employed only by the Open Door Defendants might not be able to obtain any recovery because the Open Door Defendants have few monetary assets. (*Id.* at 15.)

The Court finds that there was a significant risk that further litigation would lead to lower or likely even no recovery for Plaintiffs, particularly when other courts have found that individuals working similar jobs to Plaintiffs to be outside salespersons. This factor therefore weighs in favor of approval.

d. Scope of Release Provision and Communications about the Action

Again, the Settlement Agreement originally sought to release all claims "which could have been pled in Plaintiffs' Fourth Amended Collective and Class Action Complaint . . . ." (Settlement Agreement ¶ III.A.) The Court raised concerns, however, that the proposed release was overbroad, explaining that courts in this district "'routinely reject FLSA settlements when the scope of the release goes beyond the overtime claims asserted in the complaint.'" (Dkt. No. 309 at 1 (quoting *Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, Case No. 13-cv-5456-HSG, 2016 WL 153266, at *5 (N.D. Cal. Jan. 13, 2016)).) The Court thus informed the parties that it would deny the instant motion if the parties did not limit the scope of the release to the claims asserted in the operative complaint. (*Id.* at 4.)

11

On September 12, 2018, the parties filed a notice stating that "they have agreed to limit the scope of the release in their settlement agreement to the claims asserted in the operative complaint," and attached an amended release that paralleled that in *Selk*. (Dkt. No. 310 at 2.) Notably, in *Selk*, the district court found that the release was adequate because "[a]t oral argument, counsel for [the defendant] represented to the court that the release requires waiver of only the wage and hour claims *alleged*, and not unrelated claims." 159 F. Supp. 3d at 1178 (emphasis added). Because the parties likewise state on the record that they have agreed to limit the release to claims asserted in the operative complaint, the Court finds that the scope of release is adequate, and favors approval of the settlement.

Additionally, the Settlement Agreement's communication paragraph has been limited to act as a non-publicity provision that restricts the parties from publicizing the agreement, such as by issuing press releases or press statements. (Plf.'s Supp. Brief at 7.) The parties have modified the language accordingly. (*See* Dkt. No. 307 at 2.) Thus, the parties have addressed the Court's concern that the Settlement Agreement's language was so broad that it would prevent an opt-in Plaintiff from discussing the settlement in private conversations.

### e. Experience and Views of Counsel and Participating Plaintiffs

"In determining whether a settlement is fair and reasonable, the opinions of counsel should be given considerable weight both because of counsel's familiarity with the litigation and previous experience with cases." *Slezak*, 2017 WL 2688224, at *5. Plaintiff's counsel, Attorney Shannon Liss-Riordan, opines that the settlement is fair, reasonable, and adequate, taking into account the risks faced by Plaintiffs. (Liss-Riordan Decl. ¶¶ 3-5.) Attorney Liss-Riordan has practiced wage and hour actions, with an emphasis on independent contractor misclassification, for five years. (Liss-Riordan Decl. ¶ 2.)

Additionally, Plaintiffs distributed notice to the opt-in Plaintiffs, describing the basic terms of the settlement agreement and estimated recovery. (Liss-Riordan Decl. ¶ 6, Exh. B.) As of the date of this order, no objections have been filed with the Court, and Plaintiffs confirmed that they received no objections at the hearing. The Court therefore concludes that this factor weighs in favor of approval.

12

### f. Possibility of Fraud or Collusion

The Court finds that there does not appear to be any signs of collusion. In *In re Bluetooth Headset Products Liability Litigation*, the Ninth Circuit explained that signs of collusion in a class action include:

> (1) when counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded [citations]; (2) when the plaintiffs negotiate a 'clear sailing' agreement providing for the payment of attorney's fees separate and apart from class funds . . . [citations]; and (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund [citations].

654 F.3d 935, 947 (9th Cir. 2011).

Here, none of these signs are present. Plaintiffs' counsel is receiving 20% of the settlement amount as attorney's fees and costs, an amount which is lower than Plaintiffs' costs. There is also no "clear sailing" provision, nor will unclaimed funds revert to Defendant 20/20. The Court concludes that this factor weighs in favor of approval.

### iii. Attorney's Fees

"Where a proposed settlement of FLSA claims includes the payment of attorney's fees, the court must also assess the reasonableness of the fee award." *Selk*, 159 F. Supp. 3d at 1180; *see also* 29 U.S.C. § 216(b). Here, Plaintiffs' counsel seeks 20% of the total settlement amount, or $25,000. This amount only partially covers the amount of expenses Plaintiffs' counsel has incurred. (Liss-Riordan Decl. ¶ 8.) Plaintiffs' counsel does not explain what their lodestar would be, beyond stating that more than 600 hours have been spent prosecuting the case; nevertheless; given that the attorney's fees sought does not cover the expenses incurred, and that this case has involved litigating numerous motions, it is clear that the amount sought is significantly less than the amount that would be awarded under the lodestar method. The Court approves of the attorney's fees provision.

### iv. Enhancement Awards

The Settlement Agreement also provides for enhancement awards for the named Plaintiffs, specifically $5,000 for Plaintiff Jennings and $3,000 for Plaintiff Drake. "[A] district court may award an [enhancement] payment to the named plaintiffs in a FLSA collective action to

13

compensate them for work done on behalf of the class." *Selk*, 159 F. Supp. 3d at 1181. In determining whether an enhancement award is warranted, "the court should consider . . . the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.* (internal quotation omitted).

At the hearing, Plaintiffs' counsel explained that the named Plaintiffs participated actively in this case, including initiating the case, providing statements, cooperating with discovery, and providing information to help litigate the case. Without the named Plaintiffs, the opt-in Plaintiffs would likely have received no recovery, especially in light of the significant risks in this case. The Court also notes that in class action settlements, courts in this district have found "that, as a general matter, $5,000 is a reasonable amount" for an enhancement award. *Harris v. Vector Mktg. Corp.*, Case No. 08-cv-5198-EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012). The Court finds that the requested enhancement awards are appropriate, and approves the enhancement awards provision.

### B. PAGA Settlement

Under PAGA, "court[s] shall review and approve any settlement of any civil action filed pursuant to [PAGA]." Cal. Labor Code § 2699(l)(2). A plaintiff who brings a PAGA claim "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). "Such a plaintiff also owes responsibility to the public at large; they act, as the statute's names suggests, as a private attorney general, and 75% of the penalties go to the LWDA for 'enforcement of labor laws . . . and for education of employers and employees about their rights and responsibilities under this code.'" *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1134 (N.D. Cal. 2016).

Here, the parties allocate $10,000 to the PAGA claim, or .6% of its total estimated value of $1.4 million. (Plf.'s Mot. for Settlement Approval at 21.) In this district, courts have raised concerns about settlements of less than 1% of the total value of a PAGA claim. *See Viceral v. Mistras Grp., Inc.*, Case No. 15-cv-2198-EMC, 2016 WL 5907869, at *9 (N.D. Cal. Oct. 11, 2016). Plaintiffs submitted the settlement agreement to the LWDA, and the LWDA has not

14

objected to the settlement. (Plfs.' Supp. Brief at 8.)

For the reasons discussed above as to the risks of no recovery, particularly the *Dailey* decision, the Court finds that the PAGA settlement is adequate, despite the significant discount that the settlement represents.

### C. Rule 23 Notice

"Federal Rule of Civil Procedure 23(e) requires courts to approve the proposed voluntary dismissal of class claims. Courts generally apply the same Rule 23(e) standard to FLSA collective action settlements." *Gonzalez*, 2017 WL 1374582, at *4 (internal quotation and modification omitted). This applies to pre-certification classes as well. *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989); *see also Lyons v. Bank of Am., NA*, Case No. 11-cv-1232-CW, 2012 WL 5940846, at *1 n.1 ("Courts in this district have expressed some uncertainty about whether Rule 23(e) still applies to pre-certification settlement proposals in the wake of the 2003 amendments to the rule but have generally assumed that it does"). Thus, where parties seek to voluntarily dismiss class claims, the court must inquire into possible prejudice from:

> (1) class members' possible reliance on the filing of the action if they are likely to know of it either because of publicity or other circumstances, (2) lack of adequate time for class members to file other actions, because of a rapidly approaching statute of limitations, (3) any settlement or concession of class interests made by the class representative or counsel in order to further their own interests.

*Diaz*, 876 F.2d at 1408.

The Court finds that after applying these factors, there is no prejudice to the class members from the dismissal of the class claims without prejudice. First, there is nothing in the record to suggest that putative class members were aware of the class action. While putative class members were given notice of the FLSA collective action, the notice did not mention the class action. The case also did not receive publicity or media coverage, and Plaintiffs' counsel states that they did not receive inquiries about the Rule 23 claims from absent putative class members. (Plfs.' Supp. Brief at 10.)

Second, there does not seem to be a lack of adequate time for class members to file their own actions. The FLSA generally has a two-year statute of limitations, which is extended to three

years if the violation is "willful." *Gonzalez*, 2017 WL 1374582, at *5. Plaintiffs explain that the case was filed in September 2015, and that most of the plaintiffs worked for the company in 2014 and 2015, fairly close to the time of the filing, such that there is little risk of the absent class members' claims being barred by the statute of limitations. (*Id.*) This is particularly the case where "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).

Finally, it does not appear that Plaintiffs sought to settle the case to further their own interests. As discussed above, there is no evidence in the record of fraud or collusion between the parties in settling the case.

Therefore, the Court approves of the dismissal of the class claims without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS the motion for settlement approval, as modified by the parties. (*See* Dkt. Nos. 307, 310.)

Within 60 days of the date of this order, Plaintiffs shall file either a stipulation of dismissal of the entire case or a status report regarding the execution of the Settlement Agreement.

IT IS SO ORDERED.

Dated: October 3, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge